# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

UNITED STATES OF AMERICA     )
        )
        )
v.        )     Criminal No. 08-196-P-H
        )
        )
SUZAN E. BUNDY,     )
        )
     Defendant     )

## RECOMMENDED DECISION ON MOTION TO DISMISS
## AND MOTION TO SUPPRESS

Suzan E. Bundy, charged with (i) one count of embezzling, stealing, and converting to her own use or the use of another money or things of value of the United States or of any department or agency thereof, to wit Social Security Disability Insurance ("SSDI") benefits, in violation of 18 U.S.C. § 641, (ii) four counts of having knowledge of the occurrence of an event affecting the continued right to SSDI benefits and concealing and failing to disclose such event with the intent to fraudulently secure payment either in a greater amount than was due or when no payment was authorized, in violation of 42 U.S.C. § 408(a)(4), and (iii) two counts of making a false statement or representation of a material fact for use in determining rights to SSDI payments, in violation of 42 U.S.C. § 408(a)(3), *see* Indictment (Docket No. 16), moves to dismiss Counts 1 through 5 of the Indictment as untimely and to suppress statements she made to two special agents on August 20, 2007.  *See* Motion To Dismiss Indictment as Untimely ("Motion To Dismiss") (Docket No. 25); Motion To Suppress Statements of the Accused ("Motion To Suppress") (Docket No. 26).

1

An evidentiary hearing on both motions was held before me on March 6, 2009, at which the defendant appeared with counsel.[1]  The government tendered one witness and offered 20 exhibits, all of which were admitted without objection.  The defendant neither tendered witnesses nor offered exhibits.  At the close of the evidence, counsel for both sides argued orally.  I now recommend that the following findings of fact be adopted and that the Motion To Dismiss be granted in part and denied in part and that the Motion To Suppress be denied.

## I.  Proposed Findings of Fact

Joseph DeSantis is employed by the Social Security Administration ("SSA") Office of the Inspector General as a special agent assigned to investigate fraud and abuse in SSA programs.  In April 2007, he received a complaint from an SSA operations supervisor that the defendant, an SSDI recipient, had reported earnings to the Internal Revenue Service ("IRS") for tax years 1990 through 1994 and 1999 through 2006, and that earnings from a number of those years exceeded those allowable under the SSDI program.  *See* Gov't Exh. 9, ¶ 4.[2]  DeSantis began an investigation into possible fraud by the defendant, in the course of which he learned, among other things, that:

1.      The defendant earned a Bachelor of Science degree in nursing and went on to complete an Emergency Medical Technician program.  *See* Gov't Exh. 5.

2.      On June 27, 1990, the defendant certified in an application for SSDI benefits that she became unable to work due to her disability, uncontrollable epileptic seizures, on December 29, 1989.  *See* Gov't Exh. 9, ¶ 7, Gov't Exh. 10.[3]  She acknowledged her responsibility to

---

[1] The defendant had also moved to dismiss the Indictment for due process and Speedy Trial Act violations.  *See* Motion To Dismiss Indictment for Due Process and Speedy Trial Violations (Docket No. 24).  However, her counsel orally withdrew that motion at hearing.

[2] DeSantis adopted the contents of Government Exhibit 9, which contains his affidavit in support of the criminal complaint filed in this matter, as part of his testimony.

[3] The defendant also has used the names Suzan Hornbeck, her maiden name, and Suzan Higginbotham, a prior married name.

promptly notify the SSA if, among other things, her medical condition improved or she returned to work.  *See id.*  She acknowledged understanding that such events could affect her eligibility to receive SSDI benefits.  *See id.*[4]  While the SSA periodically requests information from beneficiaries concerning their work status, it also requires them to report changes in that status when those changes occur.

3.      On August 21, 1990, the defendant was granted SSDI benefits retroactive to June 1990.  *See* Gov't Exh. 9, ¶ 9.

4.      Beginning on about February 11, 1991, and continuing to about August 20, 1991, she worked as a Staff Registered Nurse at Parkland Medical Center in Derry, New Hampshire.  *See id.* ¶ 10.  She did not report this change of circumstance to the SSA.  *See id.*[5]

5.      Beginning on about May 4, 1992, and continuing to about June 11, 1992, she worked as an Emergency Room Registered Nurse at Bradley County Hospital in Cleveland, Tennessee.  *See id.* ¶ 11.  She did not report this change of circumstance to the SSA.  *See id.*

6.      Beginning in about July 1992 and continuing to about August 1992, she worked as a Registered Nurse at Family Home Care, Inc., in Chattanooga, Tennessee.  *See id.* ¶ 12.  She did not report this change of circumstance to the SSA.  *See id.*

---

[4] At least annually, the SSA publishes amounts of earnings that it considers to reflect substantial gainful activity ("SGA").  If a beneficiary returns to work and earns an amount exceeding the SGA level for any nine months in a 60-month period, the so-called Trial Work Period, the SSA considers the beneficiary to have made a successful return to work.  The Trial Work Period is followed by an Extended Period of Eligibility, which the SSA described in a January 4, 1994, letter to the defendant as follows: "If we must stop paying you after 9 months of trial work, we may still be able to help you.  For 36 months after your trial work period, we can pay you for any month that you are disabled and do not earn over $500 (or $300 before January 1990).  To get these benefits, you do not have to apply again.  Just let us know how much you are earning."  Gov't Exh. 16 at 3.  While beneficiaries are informed of the Trial Work Period and the Extended Period of Eligibility, they need not concern themselves with the details of those processes.  They are required only to report that they are working, and the SSA guides them through the processes.

[5] The SSA documents contacts with beneficiaries in different ways, for example, through reports of contact, documented phone calls, placement of correspondence in the beneficiary's file, or requests that the beneficiary provide information on forms.  In assessing whether the defendant reported various jobs to the SSA, DeSantis reviewed her file to determine whether it contained reports of contact or written correspondence indicating a contact with her.  He also spoke with SSA employees who might have had contact with her and reviewed the reports that she had made on official SSA forms.

3

7.      Beginning in about January 1993 and continuing to about February 1993, she worked as a Registered Nurse for Eure Professional Staffing, Inc., in Portsmouth, Virginia.  *See id*. ¶ 13.  She did not report this change of circumstance to the SSA, and she failed to disclose it during a Continuing Disability Review ("CDR") in September 1993.  *See id*.

8.      These periods of employment triggered an SSA CDR – Work.  *See id*. ¶ 14.  On September 30, 1993, the defendant certified on an SSA form, Work Activity Report – Employee, that she had worked at Parkland Medical Center from February 11, 1991, through August 20, 2001, and at Bradley County Hospital from May 11, 1992, through June 9, 1992.  *See id*.  She did not disclose work at Family Home Care or Eure Professional Staffing.  *See id*.  She signed the review, affirming the truth of the information that she had given and acknowledging that it was a crime to make a false statement of material fact therein.  *See id*.  She also certified in an SSA form, Report of Continuing Disability Interview, which she signed under penalty of perjury, that she agreed to notify the SSA if her medical condition improved or she returned to work.  *See id*.

9.      Beginning in about October 1993 and continuing to about June 1994, she worked as a Float Registered Nurse for Sentara Personnel Services in Norfolk, Virginia.  *See id*. ¶ 15.  She did not report this change of circumstance to the SSA.  *See id*.

10.     On November 12, 1993, in response to the information obtained during the CDR in September 1993, the SSA informed her via letter that she had completed nine Trial Work Period months: February through August 1991, and May and June 1992.  *See id*. ¶ 16.  On January 4, 1994, she was reminded via letter from the SSA of her reporting requirements and how the Trial Work Period operates.  *See id*. ¶ 17.

4

11.     On March 2, 1997, she signed an SSA CDR – Medical.  *See id.* ¶ 18.  In an SSA Report of Continuing Disability Interview, she stated that she had not worked since the date of her disability.  *See id.*  She certified that she agreed to notify the SSA if her medical condition improved or if she returned to work.  *See id.*  She signed the review, affirming the truth of the information that she had given and acknowledging that it was a crime to make a false statement of material fact therein.  *See id.*

12.     On August 12, 1997, the SSA stopped the defendant's SSDI benefits based on the findings of the medical CDR.  *See id.* ¶ 19.  She was found to no longer have a medical condition that would prevent her from obtaining and maintaining employment above the SGA level.  *See id.*  She was living in New Jersey at the time.  *See id.*

13.     On August 22, 1997, the defendant filed a request for reconsideration in Massachusetts.  *See id.* ¶ 20.  She was afforded the opportunity to continue to receive benefits during the appeals process and elected to do so.  She completed an SSA form, Work Activity Report – Employee, in which she disclosed work at Family Home Care, Inc., as a Registered Nurse, from July 1992 through August 1992, Sentara Health Systems, as a Registered Nurse, from November 1993 through January 1994, and at Eure Professional Staffing, Inc., as a Registered Nurse from January 1993 to February 1993.  *See id.*  She did not disclose work at Parkland Medical Center or Bradley County Hospital.  *See id.*  She signed the review, affirming the truth of the information that she had given and acknowledging that it was a crime to make a false statement of material fact therein.  *See id.*  In addition, she completed an SSA form, Reconsideration Report for Disability Cessation, signed under penalty of perjury and dated August 22, 1997, certifying that she agreed to notify the SSA if her medical condition improved or she returned to work.  *See id.*

5

14.     By letter dated December 16, 1997, she was informed that her application for reconsideration of cessation of her SSDI benefits had been denied.  *See id.* ¶ 21.

15.     On December 30, 1997, in Maryland, she filed a second request for reconsideration of the cessation of her benefits.  *See id.* ¶ 22.  She prevailed, and her benefits were continued as a result of this request.  *See id.*

16.     Beginning on about May 3, 1999, and continuing to about October 1, 2000, the defendant worked as a Clinical Nurse for Washington Hospital Center in Baltimore, Maryland.  *See id.* ¶ 23.  She did not report this change of circumstance to the SSA.  *See id.*

17.     Beginning on about November 28, 2000, and continuing to about February 15, 2001, the defendant worked as a Registered Nurse for York Hospital in York, Maine.  *See id.* ¶ 24.  She did not report this change of circumstance to the SSA.  *See id.*

18.     Beginning on about April 16, 2001, and continuing to about November 5, 2001, she worked as a Staff Registered Nurse for Portsmouth Regional Hospital in Portsmouth, New Hampshire.  *See id.* ¶ 25.  She did not report this change of circumstance to the SSA.  *See id.*

19.     Beginning on about August 5, 2002, and continuing to at least April 14, 2008, she was employed by Maine Medical Center in Portland, Maine.  *See id.* ¶ 26.  She worked at Maine Medical Center from about August 5, 2002, to September 14, 2005, when she began collecting short-term disability insurance benefits.  *See id.*  On March 16, 2006, she was switched from short-term disability benefits to long-term disability benefits.  *See id.*  She did not report these changes of circumstance to the SSA.  *See id.*

20.     In November 2003 and January 2004, the SSA made two attempts to contact the defendant for a CDR – Medical.  *See id.* ¶ 27.  When these attempts failed, the SSA suspended her benefits on the basis of the lack of a correct address.  *See id.*

21. On approximately April 5, 2004, the defendant visited the SSA office in Saco, Maine, to address her benefit suspension and request an "Immediate Payment." *See id*. ¶ 28. As a result, she completed and signed an SSA form, Report of Continuing Disability Interview. *See id*. In that report, she disclosed that she worked as a Registered Nurse at a "hospital/Inpatient" for an unknown period of time in 1999. *See id*. She did not disclose any other work history. *See id*. She signed the review, affirming the truth of the information that she had given and acknowledging that it was a crime to make a false statement of material fact therein. *See id*. In addition, she certified that she agreed to notify the SSA if her medical condition improved or if she returned to work. *See id*. She agreed to return to the Saco SSA office on April 6, 2004, to complete her CDR – Medical. *See id*.

22. In preparation for the CDR – Medical, an SSA employee listed on an SSA form, Work Activity Report – Employee, the names of each employer generated by a Detailed Earnings Query for the defendant for the years 1990 through 2002. *See id*. ¶ 29. The SSA employee left the details, such as dates and amounts earned, for each job blank for the defendant to complete. *See id*.

23. On about April 6, 2004, the defendant returned to the Saco, Maine, SSA office to complete her CDR- Medical. *See id*. ¶ 30. She completed the SSA form, Work Activity Report – Employee, by filling in specific details about each job listed by the SSA. *See id*.; Gov't Exh. 30. She signed and dated that form on April 6, 2004. *See id*. She acknowledged that it was a crime to make a false statement of material fact therein. *See id*. When completing her paperwork, she certified that her most recent employment was at Maine Health (also known as Maine Medical Center) in Portland, Maine, from August 2002 through January 2003. *See id*.

She did not disclose that she was working at Maine Medical Center at the time of the report. *See id.*

24. As part of that review, an SSA employee sent an SSA Wage Verification form to Maine Medical Center. *See* Gov't Exh. 9, ¶ 31. Maine Medical Center returned this form dated April 16, 2004. *See id.* It disclosed that the defendant began employment with Maine Health on August 5, 2002, and was still employed there as of the reporting date April 16, 2004. *See id.* It contained a monthly breakdown of the defendant's earnings with the following annual totals: $14,353.60 in 2002, $23,183.36 in 2003, and $10,950.25 for January through April 2004. *See id.*

25. In approximately April 2004, the defendant's SSDI benefits were terminated by the SSA retroactive to August 1999 based on her employment and earnings. *See id.* ¶ 32. The SSA determined, based on her employment and earnings, that her combined Trial Work Period and Extended Period of Eligibility had ended in August 1999.

26. On about February 2, 2007, the defendant filed a new application for SSDI benefits. *See id.* ¶ 34. She signed and dated an SSA form, Statement of Claimant or Other Person, on that date. *See id.* On that form, she claimed to have reviewed her earnings record and certified it to be correct. *See id.* She signed the form affirming the truth of the information that she had given and acknowledging that it was a crime to make a false statement of material fact therein. *See id.* In addition, in her application for SSDI benefits, she claimed that she began working at Maine Medical Center in 2004 and continued working there until September 2005. *See id.* She signed the form affirming the truth of the information she had given and acknowledging that it was a crime to make a false statement of material fact therein. *See id.* She further certified that she agreed to notify the SSA if her medical condition improved or if she returned to work. *See id.*

DeSantis reached a point in his investigation at which he decided to interview the defendant. He tried unsuccessfully to contact her at home on two occasions. He then asked the Saco SSA office to send her a letter requesting that she come to that office. The SSA office did so, and an appointment was made and then rescheduled for August 20, 2007, at 10:30 a.m. *See* Gov't Exh. 38. The SSA office did not disclose the purpose of the meeting. *See id*.

On August 20, 2007, DeSantis and John Cremonini, a fellow special agent of the SSA Officer of the Inspector General, arrived at the Saco SSA office ahead of the scheduled appointment time. The Saco SSA office contains a public space in which there is a counter with a row of windows, much like in a bank, from which SSA employees assist members of the public. Behind those customer service windows is an office space containing cubicles for SSA employees and two semi-private supervisors' offices. In the supervisors' offices, one of the walls consists almost entirely of windows that look out over the rest of the SSA office.

DeSantis and Cremonini, both of whom were dressed in plainclothes with their service weapons concealed beneath their clothing, borrowed a supervisor's office and sat in chairs behind the desk, facing the door. When the defendant arrived, her SSA claims representative escorted her to the supervisor's office and left her in the agents' company. DeSantis and Cremonini introduced themselves, explaining that they were special agents employed by the SSA Office of the Inspector General and that they were there to ask questions relating to a complaint they had received regarding her benefits. DeSantis told the defendant that the interview was voluntary, that she was not under arrest or detained, and that she could choose to answer questions, choose not to answer specific questions, or decide at any time to stop the interview and leave. He asked her if she understood, and she said yes. He then asked whether she agreed to speak with himself and Cremonini, and she said yes.

The defendant sat in a chair facing DeSantis and Cremonini, with her back to the door. Throughout the interview, the door remained open, and nothing blocked her egress from the office. Neither DeSantis nor Cremonini used any physical force, displayed their weapons to the defendant, or employed verbal threats to her. Apart from shaking her hand when she left, DeSantis had no physical contact with her.

After the defendant confirmed her willingness to speak with agents, DeSantis went into greater detail regarding the reasons for the questioning, explaining that the complaint that agents were investigating alleged that she was employed while collecting disability benefits. He had refrained from providing that detail before she agreed to speak with agents to avoid the risk that, if she did not agree, she might destroy evidence.

DeSantis learned that the defendant was married and that her husband worked as a civilian federal uniformed police officer for the Department of Defense at the Portsmouth, New Hampshire, naval station. He went over the defendant's history with SSA and her work history, showing her some of the documents that he had collected during the course of his investigation. He asked why she had not reported working, and she said that it was her understanding that she had to work nine consecutive months before having to report. She also explained that any errors she had made were based on a lack of understanding.

DeSantis then showed the defendant documents discrepant with her explanation, including documents showing that she had worked for Maine Medical Center for years without reporting that work. When pressed as to the discrepancy even as to her own purported misunderstanding, the defendant's demeanor, which had been friendly and pleasant, changed. She sat back in her chair and said, "What do you want me to say?" After being shown additional documents and asked additional questions by DeSantis about apparent discrepancies, she

admitted that she had failed to report her work during her 2004 CDR because she knew that reporting it would affect and possibly terminate her benefits.

DeSantis wrote out a statement that the defendant signed, swearing to its truth. *See* Gov't Exh. 40. Before she signed it, he read it aloud to her and allowed her the opportunity to read it and make changes. After she signed it, he shook her hand, and she departed. She was not placed under arrest that day.

Cremonini was present for the interview primarily to serve as a witness. He had only minimal conversation with the defendant. At no point did DeSantis or Cremonini administer to the defendant warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).[6]

## II. Analysis

### A. Motion To Dismiss

As a threshold matter, the defendant moves to dismiss Counts 1 through 5 of the Indictment as untimely on the basis that the vast majority of the charged conduct falls outside of the applicable five-year period of limitations. *See* Motion To Dismiss at 1. "[T]he government bears the burden of proving that the prosecution was started within the applicable statute of limitations period." *United States v. Ferris*, 807 F.2d 269, 272 (1st Cir. 1986).

There is no dispute that (i) the applicable statute of limitations, found at 18 U.S.C. § 3282(a), is five years, (ii) the first charging document that the government secured in this matter was dated August 5, 2008, and (iii) the government accordingly is barred from prosecuting conduct occurring before August 5, 2003, unless that conduct qualifies as a so-called "continuing offense." *See* Motion To Dismiss at 1; United States['] Consolidated Opposition to

---

[6] Per *Miranda*, an accused must be advised prior to custodial interrogation "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 478-79.

Defendant's Motions To Dismiss and Suppress ("Opposition") (Docket No. 28) at 8-11.  The question presented is whether the offenses charged in Counts 1 through 5 qualify as "continuing offenses."  *See id*.

The government contends that these offenses are continuing offenses because they are all part of the same ongoing fraudulent scheme of continuing to secure SSDI benefits unlawfully by failing to report work in the face of a duty to make such disclosures.  *See* Opposition at 10-11.  I find this argument persuasive with respect to Counts 2 through 5, but not Count 1.

### 1.  Nature of a "Continuing Offense"

"The limitations period will normally begin to run when a crime is 'complete,' thereby encouraging law enforcement officials promptly to investigate suspected criminal activity." *United States v. Rivera-Ventura*, 72 F.3d 277, 281 (2d Cir. 1995) (citation and internal quotation marks omitted); *see also, e.g., United States v. Yashar*, 166 F.3d 873, 875 (7th Cir. 1999) ("An offense is committed when it is completed, that is, when each element of that offense has occurred.") (citations omitted).

As the United States Court of Appeals for the Seventh Circuit has explained:

An exception has been recognized for "continuing offenses."  That is a term of art, and does not merely mean an offense that continues in a factual sense.  An offense is deemed "continuing" for statute of limitations purposes only when (a) "the explicit language of the substantive criminal statute compels such a conclusion," or (b) "the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one."

*Id*. (quoting *Toussie v. United States*, 397 U.S. 112, 115 (1970)).

The Supreme Court decreed in *Toussie* that the continuing offense exception be applied only in these "limited circumstances" in deference to the policy concerns animating statutes of limitations, which are "designed to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize

the danger of official punishment because of acts in the far-distant past" and "are to be liberally interpreted in favor of repose." *Toussie*, 397 U.S. at 114-15. "[T]he tension between the purpose of a statute of limitations and the continuing offense doctrine is apparent; the latter, for all practical purposes, extends the statute beyond its stated term." *Id*. (citation and internal quotation marks omitted).

"The classic example of a continuing offense is a conspiracy, but other offenses such as escape or kidnapping also may fall within those definitions." *Yashar*, 166 F.3d at 875. "The hallmark of the continuing offense is that it perdures beyond the initial illegal act, and that 'each day brings a renewed threat of the evil Congress sought to prevent' even after the elements necessary to establish the crime have occurred." *Id*. (quoting *Toussie*, 397 U.S. at 122). "For those crimes, the statute of limitations does not begin to run when all elements are first present, but rather begins when the offense expires." *Id*. at 875-76. *See also, e.g.*, *United States v. Pease*, No. CR-07-757-PHX-DGC, 2008 WL 808683, at *2 (D. Ariz. Mar. 24, 2008) ("Classic examples of continuing offenses include conspiracy, escape, kidnapping, bigamy, and crimes of possession. These crimes, once committed, continue in effect until affirmatively ended. For example, when a defendant escapes from custody, the defendant remains in an escaped status continuously until re-arrested. Similarly, a defendant who takes possession of contraband continues to possess the contraband day after day until the possession ceases. By their very nature, these offenses continue.") (citations omitted).

### 2. Count 1: Violation of 18 U.S.C. § 641

Count 1 of the Indictment charges that beginning in about February 1991 and continuing until about April 2004, in the District of Maine and elsewhere, the defendant "embezzled, stole, converted to her own use or the use of another, money, or things of value of the United States or

any department or agency thereof, to wit Social Security Disability Insurance benefits[,]" in violation of 18 U.S.C. § 641.  Indictment at 1.

> Section 641 provides, in relevant part:
>
> Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys, or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or
>
> Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted –
>
> Shall be fined under this title or imprisoned not more than ten years, or both[.]

18 U.S.C. § 641.

As counsel for the government acknowledged at oral argument, the Indictment charges the defendant only under the first paragraph of section 641.  The government does not contend that this language explicitly compels the conclusion that the offense is a continuing one, thereby satisfying the first *Toussie* test.  *See* Opposition at 10.  In any event, like other courts considering the matter, I conclude that it does not.  *See Pease*, 2008 WL 808683, at *2 (finding, for purposes of first *Toussie* test, "nothing in the language of the first paragraph [of section 641] to suggest that Congress intended to create a continuing offense.").

A more difficult question is presented as to whether, for purposes of Count 1, the second *Toussie* test is satisfied.  My research reveals no First Circuit or District of Maine case considering whether the nature of the offense described in the first paragraph of section 641 is such that Congress must assuredly have intended that it be treated as a continuing one.  Courts in other jurisdictions are split on the question.  *Compare e.g., United States v. Smith*, 373 F.3d 561, 567-68 (4th Cir. 2004) ("At least in those cases where the defendant created a recurring, automatic scheme of embezzlement under section 641 by conversion of funds voluntarily placed

14

in the defendant's possession by the government, and maintained that scheme without need for affirmative acts linked to any particular receipt of funds[,] . . . we think that Congress must have intended that such be considered a continuing offense for purposes of the statute of limitations."); *United States v. Street*, Criminal No. 3:07CR181TSL-JCS, 2008 WL 4372737, at *3 (S.D. Miss. Sept. 19, 2008) (regardless of the language of the charging document, "a charge of conversion or theft under the first paragraph of § 641, in and of itself, could amount to a continuing offense") *with Pease*, 2008 WL 808683, at *3 (regardless of the language of the charging document, "the crime of conversion of government funds as codified in the first paragraph of § 641 is not a 'continuing offense'").

At hearing, counsel for the government advocated that the court adopt the position that the conduct charged in Count 1 is inherently a continuing offense or, alternatively, as held in *Smith*, should be considered as such in the case of a recurring, automatic scheme, which he posited happened here.  Defense counsel urged the court to conclude that the charge inherently is not a continuing offense and, alternatively, should the reasoning of *Smith* be adopted, that the conduct charged cannot fairly be characterized as an automatic, recurring scheme.

I conclude, as did the court in *Pease*, that the crime of conversion of government funds codified in the first paragraph of section 641 inherently is not a continuing offense.  As the *Pease* court noted, *Toussie* demands that courts "look to the nature of the offense codified" to "determine whether it is of such a nature that Congress must assuredly have intended that it be treated as a continuing offense." *Pease*, 2008 WL 808683, at *2.  "In making this determination, it is not the active or passive nature of a defendant's actions that matters, but rather whether the statute describes an offense that by its nature continues after the elements have been met." *Id.* (citation and internal punctuation omitted).  *See also, e.g., Yashar*, 166 F.3d at 877 ("[T]he active

or passive nature of a defendant's actions has never been the benchmark of a continuing offense under *Toussie*.  Instead, the focus is on the statutory language.  If the statute describes an offense that by its nature continues after the elements have been met, then the offense is a continuing one regardless of the nature of defendant's actions beyond that point.").

As the *Yashar* court persuasively reasoned, the danger of adopting the approach of looking to the nature of the underlying conduct charged and equating "a continuing course of conduct or scheme" with a continuing offense under *Toussie*, *see id.*, is that "a prosecutorial decision regarding the scope of the charge would determine the running of the limitations period":

> In that manner, the statute of limitations, designed as a control on governmental action, would instead be defined by it.  Virtually any criminal actions that extend over time could fall within this expansive definition depending upon how a prosecutor chose to charge a case. . . .  Under the government's argument, that charging decision could delay the running of the limitations period on the discrete offenses.  For instance, a series of drug sales could be charged as a single scheme. The government could then wait to prosecute until well beyond five years after the initial drug sales, as long as at least one overt act occurred within the last five years, and regardless of whether that one act constituted an element of the charged crime.  With this approach, the limitations period would be virtually unbounded.

*Id.* at 878-79.[7]

Several courts, holding that the question of whether the first paragraph of section 641 is a continuing offense must be determined without reference to the nature of the defendant's conduct, have concluded that a violation of that statute is not a continuing offense.  *See, e.g., United States v. Silkowski*, 32 F.3d 682, 690 (2d Cir. 1994) ("[W]e note that several district courts have construed a violation of section 641 as a noncontinuing offense regardless of the

---

[7] In *Yashar*, the government conceded that the offense charged, a violation of 18 U.S.C. § 666, was not a continuing offense for purposes of *Toussie* but argued that it constituted a "continuing course of conduct" that straddled the limitations period, as a result of which *Toussie* was inapplicable and there was no limitations problem.  *See Yashar*, 166 F.3d at 876.  While, in this case, the government argues that the offense is a continuing one under *Toussie*, its counsel at hearing made an argument substantively similar to that made by the government in *Yashar*, namely, that the defendant engaged in a continuing scheme, which she never renounced, despite gaps in the overall time period during which the scheme allegedly continued.

16

language contained in the underlying charging document[.]"); *Pease*, 2008 WL 808683, at *3.

They have done so for good reason.  As the *Pease* court observed:

> [C]onversion is simply the wrongful assumption and exercise of control over
> another's property.  What the converter intends to do (or in fact does) with the
> converted property is irrelevant: the act of "conversion" is completed upon the
> initial interference with the owner's interest.  Given this nature of conversion, the
> Court cannot conclude that Congress assuredly must have intended that the
> offense in the first paragraph of § 641 be treated as a continuing one.

*Id.* at *2 (citations and internal punctuation omitted).  *See also, e.g., United States v. Rivlin*, No.

07 Cr. 524(SHS), 2007 WL 4276712, at *1, *3 (S.D.N.Y. Dec. 5, 2007) (rejecting argument that

a violation of 18 U.S.C. § 664, which makes it an offense for a person to embezzle or convert to

his own use any funds of an employee pension benefit plan, constitutes a continuing offense for

*Toussie* purposes; reasoning, "[w]hile it is true that embezzlement is the type of crime that, to

avoid detection, often occurs over some time and in relatively small, but recurring, amounts, the

embezzlement of money from an employee benefit fund is not *inherently* a prolonged course of

conduct") (citations and internal punctuation omitted) (emphasis in original).

     The government cites no authority that persuades me that the result should be otherwise.

Caselaw upon which it relies, insofar as it concerns Count 1, is either unpersuasive or

distinguishable.  *See* Opposition at 10 (citing *United States v. Blizzard*, 27 F.3d 100, 102-03 (4th

Cir. 1994); *United States v. Aubrey*, 53 F. Supp.2d 1355 (E.D. Tex. 1999); *United States v.

Frezzo*, 659 F. Supp. 54, 57-58 (E.D. Pa. 1987); *United States v. Fleetwood*, 489 F. Supp. 129,

131 (D. Or. 1980); and *United States v. Morrison*, 43 F.R.D. 516, 519 (N.D. Ill. 1967)).  *Blizzard*

and *Fleetwood* are distinguishable in that they address a charge of violation of the second

paragraph of section 641, which targets receipt, concealment, and retention of stolen government

funds.  *See Blizzard*, 27 F.3d at 101-03; *Fleetwood*, 489 F. Supp. at 130, 132, *disapproved of on

other grounds by United States v. Wyatt*, 737 F.2d 1499 (9th Cir. 1984).  *Aubrey* relies on the

approach criticized in *Yashar* of looking to the nature of the defendant's conduct. *See Aubrey*, 53 F. Supp.2d at 1355-56. *Frezzo* is distinguishable in that it pertains to a charge of concealment of stolen goods. *See Frezzo*, 659 F. Supp. at 57-58. Finally, *Morrison* is distinguishable in that it pertains to a charge pursuant to 42 U.S.C. § 408(d) of concealment and failure to disclose to the SSA the death of the defendant's mother. *See Morrison*, 43 F.R.D. at 517, 519.

I recommend that the court side with well-reasoned authority and deem violation of the first paragraph of section 641 not to be a continuing offense for purposes of *Toussie*. At hearing, the defendant's counsel argued that such a conclusion should result in dismissal of Count 1 in its entirety, even though that count charges conduct continuing until about April 2004, subsequent to the limitations cutoff of August 5, 2003. For that proposition he cited no authority, and I find none. Therefore, I recommend that the motion to dismiss Count 1 on statute of limitations grounds be granted in part insofar as it targets conduct occurring before August 5, 2003, and otherwise be denied.[8]

### 3. Counts 2-5: Violation of 42 U.S.C. § 408(a)(4)

Counts 2 through 5 of the Indictment charge that, beginning at various points in time and continuing in each case until about April 2004, the defendant, having knowledge of the occurrence of an event affecting the continued right to SSDI benefits, concealed and failed to

---

[8] Were the court to disagree and adopt the *Smith* approach, the outcome with respect to Count 1 would be the same. The defendant's counsel persuasively argued at her hearing that she did not engage in an automatic, recurring scheme. Her entitlement to SSDI benefits depended not only on whether she worked, but also on how much she earned and whether she exceeded the Trial Work Period. For certain years, 1994 through 1998, she had minimal earnings or did not work at all. Unlike in *Smith* and its progeny, she cannot be said to have engaged since 1991 in an automatic scheme that required no further affirmative act on her part. *Compare, e.g., Smith*, 373 F.3d at 568 (defendant "set into place and maintained an automatically recurring scheme whereby funds were electronically deposited in his account and retained for his own use without need for any specific action on his part, a scheme which continued from his mother's death until payments were terminated in February of 1998"); *United States v. Gibson*, No. 08-03057-01-CR-S-DGK, 2008 WL 4838226, at *3 (W.D. Mo. Nov. 6, 2008) ("As in *Smith*, defendant in the instant case is charged with creating a recurring, automatic scheme of embezzlement under § 641 by conversion of funds voluntarily placed in his possession by the government, and maintained that scheme without any need for affirmative acts linked to any particular receipt of funds. He effectuated this scheme by failing to notify the SSA of his relationship with Robbins, which would have affected the payments he was receiving from the SSA.").

disclose such event with the intent to fraudulently secure payment either in a greater amount than was due or when no payment was authorized, in violation of 42 U.S.C. § 408(a)(4).  *See* Indictment at 1-4.  Section 408(a)(4) provides that a person is guilty of a felony if, "having knowledge of the occurrence of any event affecting (1) his initial or continued right to any payment under this subchapter, or (2) the initial or continued right to any payment of any other individual in whose behalf he has applied for or is receiving such payment, conceals or fails to disclose such event with an intent fraudulently to secure payment either in a greater amount than is due or when no payment is authorized[.]"  42 U.S.C. § 408(a)(4).

The defendant is alleged to have violated section 408(a)(4) by concealing and failing to disclose her employment at Washington Hospital Center/Medlantic Healthcare Corporation (Count 2), York Hospital (Count 3), Portsmouth Regional Hospital (Count 4), and Maine Medical Center (Count 5).  *See id.*

The defendant complains that these charges run afoul of the statute of limitations because they are not continuing offenses, she left three of those jobs prior to August 5, 2003, and, with respect to the fourth job, at Maine Medical Center, the government faults her for not reporting employment when she had injuries and severe asthma attacks that prevented her from returning to work full-time.  *See* Motion To Dismiss at 2-3.

The government counters that these Social Security fraud charges are indeed continuing offenses, that they were ongoing until the defendant's malfeasance was discovered and her benefits terminated in April 2004, and that each instance of Social Security fraud began with either her failure to report new employment within the statute of limitations, her failure to disclose work on periodic review forms, or her affirmative misstatement on such forms of the amount of work she had done.  *See* Opposition at 10-11.

The government has the better argument.  The gravamen of Counts 2 through 5 is concealment and failure to disclose.  As the government suggests, this crime, like the classic continuing offenses of conspiracy, escape, kidnapping, bigamy, and crimes of possession, by its nature continues in effect until affirmatively ended, in this case, by revelation of the concealment.  *See id.*; *see also, e.g., United States v. Stein*, 233 F.3d 6, 18 (1st Cir. 2000) ("Concealement by its nature is an act which goes on until detected or its consequences are purged.") (citation and internal punctuation omitted); *Frezzo*, 659 F. Supp. at 57-58 ("[C]oncealment constitutes an ongoing crime.  The government alleges that defendant concealed some of the rugs until August 1982.  Therefore, the statute of limitations will not bar the prosecution of the concealment charge."); *Morrison*, 43 F.R.D. at 519 (charge that the defendant willfully and knowingly failed to disclose the death of her mother to the SSA, in violation of 42 U.S.C. § 408(d), constituted a continuing offense, with the concealment continuing until a date well within the five-year statute of limitations period).

In the case of each of Counts 2 through 5, the government charges concealment continuing through approximately April 2004, within the limitations period.  Accordingly, I recommend that the defendant's motion to dismiss these counts on statute-of-limitation grounds be denied.

### B.  Motion To Suppress

The defendant next seeks to suppress statements she made to DeSantis and Cremonini at the Saco SSA office on August 20, 2007, on grounds that those statements were made involuntary and without benefit of *Miranda* warnings.  *See* Motion To Suppress at 1-2.  The government bears the burden of proving both *Miranda* compliance, *see, e.g., United States v. Barone*, 968 F.2d 1378, 1384 (1st Cir. 1992), and the voluntariness of a confession, *see, e.g.,*

*United States v. Jackson*, 918 F.2d 236, 241 (1st Cir. 1990).  For the reasons that follow I conclude, and recommend that the court find, that it meets its burden with respect to both.

### 1.  Applicable Legal Standards

### a.  Voluntariness of Confessions

Involuntary confessions violate the due-process clauses of the Fifth and Fourteenth amendments.  *See, e.g., United States v. Genao*, 281 F.3d 305, 310 (1st Cir. 2002).  In the face of a defendant's claim that her confession was extracted involuntarily, the government bears the burden of showing, based on the totality of the circumstances, that investigating agents neither "broke" nor overbore her will.  *Chambers v. Florida,* 309 U.S. 227, 239-40 (1940).  As this language suggests, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary[.]'" *Colorado v. Connelly,* 479 U.S. 157, 167 (1986).  *See also, e.g., Rice v. Cooper*, 148 F.3d 747, 750 (7th Cir. 1998) (in context of voluntariness of confession, "[t]he relevant constitutional principles are aimed not at protecting people from themselves but at curbing abusive practices by public officers.") (citation omitted).

### b.  *Miranda* Warnings

The obligation of an officer to administer *Miranda* warnings attaches "only where there has been such a restriction on a person's freedom as to render her 'in custody.'" *Stansbury v. California*, 511 U.S. 318, 322 (1994) (citations and internal quotation marks omitted).  Whether a person can be considered to have been in custody depends on all of the circumstances surrounding the interrogation, but "the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."  *Id*. (citation omitted).

The determination whether there was such a restraint on freedom of movement hinges "on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Id*. at 323. *See also United States v. Quinn*, 815 F.2d 153, 157 (1st Cir. 1987) (relevant inquiry "is how a reasonable man in the suspect's position would have understood his situation") (citation and internal quotation marks omitted).

"Among the factors to consider" in making a *Miranda* custody determination "are whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." *United States v. Nishnianidze*, 342 F.3d 6, 13 (1st Cir. 2003) (citation and internal quotation marks omitted).

## 2.  Analysis: Voluntariness of Statements

The defendant contends that her will was overborne, and her statements hence were rendered involuntarily, when agents continued to insist that she had committed criminal conduct and to refute her assertions that any errors were innocently made. *See* Motion To Suppress at 2. She argues that she became emotional and distraught by the serious accusations leveled against her, to the point where her will to maintain her innocence was overborne and she finally stated, "I don't know what you want me to say." *See id*. In these circumstances, the resultant written statement, penned by one of the investigating agents, was unreliable, her counsel contended at hearing.

The government argues, and the evidence bears out, that the defendant, a well-educated woman sophisticated enough to have worked in a demanding profession and to have applied for and maintained SSDI benefits in the face of ongoing reviews, was not subjected to coercive

police tactics but rather to persistent and pointed questioning of a kind that is well within the bailiwick of good detective work.  *See* Opposition at 8.  The defendant was apprised at the outset of the meeting that she was not under arrest and was free to leave or stop the questioning at any time.  The door behind her remained open, and nothing blocked her egress from the room.  At no point did agents display weapons to her, raise their voices, or threaten her.  She was questioned almost exclusively by DeSantis and had minimal conversation with Cremonini, who was there primarily to serve as a witness.  There is no evidence that DeSantis told her what to say.  When he wrote out her statement, he read it to her and permitted her an opportunity to read and change it.  DeSantis was not obliged to accept at face value her explanations or protestations of innocence.  While his persistence in pointing out discrepancies may well have upset the defendant, it was not, in the circumstances, a coercive police tactic that overbore her will.

### 3.  Analysis: Necessity of *Miranda* Warning

No *Miranda* warning was administered to the defendant throughout her encounter with agents at the Saco SSA office on August 20, 2007.  However, the government argues persuasively that such a warning was not required because the defendant was not "in custody" for *Miranda* purposes.

The interview in question transpired in what might fairly be termed a "neutral" location.  While the defendant was not in the familiar and comfortable surroundings of her own home, she was not in a police station but rather in a supervisor's office in her local SSA building, where she had previously conducted business.

The nature and character of the questioning strongly cut against a finding that a reasonable person in the defendant's shoes would have considered herself to be "in custody," that is, restrained in freedom of movement to a degree associated with a formal arrest.  *See*

*Stansbury*, 511 U.S. at 322.  Only two agents were present, and the defendant was questioned almost exclusively by only one of them.  No physical force was applied to her, no voices were raised, no weapons were displayed, and no threats were made.  The defendant was apprised at the outset of the meeting that she was free to leave or terminate the questioning at any time.  In keeping with that assertion, she was seated in the chair closest to the door, which remained open throughout the interview, with nothing blocking her egress from the room.  Almost one entire wall of the office consisted of a window looking out over the public areas of the SSA office, underscoring the feeling that the defendant was not restrained to a degree tantamount to a formal arrest.  While the defendant understandably was upset by DeSantis' persistent questioning regarding seeming discrepancies in her explanations, nothing prevented her from stopping the questioning and leaving, as indeed she did at the conclusion of the interview.  In the totality of the circumstances, she was not "in custody" for *Miranda* purposes.  Accordingly, no *Miranda* warning was required.

### III.  Conclusion

For the foregoing reasons, I recommend that that the Motion To Dismiss be **GRANTED** as to that portion of Count 1 of the Indictment targeting conduct that occurred prior to August 5, 2003, and otherwise **DENIED**, and that the Motion To Suppress be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof.   A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the*

*objection.*

      *Failure to file a timely objection shall constitute a waiver of the right to <u>de</u> <u>novo</u> review by the district court and to appeal the district court's order.*

      Dated this 31st day of March, 2009

                         <u>/s/  John H. Rich III  </u>
                         John H. Rich III
                         United States Magistrate Judge